UNITED STATES of America, Petitioner-Plaintiff,

v.

69.67 ACRES OF LAND, MORE OR LESS, SITUATE IN THE TOWN OF OYSTER BAY, COUNTY OF NASSAU, State of New York, and Margaret J. Chase, et al., Defendants.

No. C. P. 93.

United States District Court
E. D. New York.

July 16, 1957.

---◆---

Harry T. Dolan, Sp. Asst. to the Atty. Gen. of the United States, for petitioner-plaintiff.

Vollmer, Wildermuth and Dixson, Brooklyn, N. Y., and Edward J. Ledogar, Jr., Jamaica, N. Y., for defendants Chase, et al., by Geo. C. Wildermuth and Charles M. McCarty, Brooklyn, N. Y., of counsel.

Edwards, Froehlich & McDonough, Mineola, N. Y., for defendant Froehlich,

by Francis B. Froehlich and Henderson Morrison, Jr., Mineola, N. Y., of counsel.

BYERS, District Judge.

This condemnation proceeding involves two tracts of land, in the Village of Brookville, Nassau County, Long Island, known and referred to herein as the Chase and Froehlich properties. They are separately owned, and are comprehended in the one proceeding because a portion of each was required by the Government for the erection and maintenance of a guided missile installation known as a Nike site.

What is known as the control element was erected on part of the Chase property, and the launching element on part of the Froehlich property.

It should be said at the outset, that the Court understands that the operations there conducted do not involve the actual launching of such missiles, but the training of personnel in all technical and practical incidents of actual warfare involved in this branch of the Service; also the maintenance at the launching element, of all ammunition and materiel that would be necessarily employed in the event of hostilities.

It is understood that the actual launching and testing of such guided missiles is conducted only upon Government property in the Southwestern part of the United States.

So much is deduced from the testimony of the Commanding Officer (Captain Chaulk) given at the trial, and if the defendants are advised that the Court has misinterpreted what he deposed in this respect, they should have the opportunity to reopen the case for appropriate exploration of the subject so far as that is consistent with national security.

The matter is of importance concerning severance damage, as will be seen.

The Chase property as a whole was of about 140 acres of vacant land on May 25, 1954, the date of the order for possession. Of this total, some 23.40 acres make up these damage parcels, namely:

|        |       |           | Acre  |
|--------|-------|-----------|-------|
| A 100  |       | Fee       | 6.98  |
| A 100 E–1 | Easements |        | .95   |
| A 100 E–2 |       | "         | 1.31  |
| A 100 E–3 |       | "         | 7.78  |
| A 100 E–4 |       | "         | 6.38  |
|        |       |           | 23.40 |

The Froehlich property consisted of about 276 acres, of which the damage parcels are:

|        |       |           | Acres |
|--------|-------|-----------|-------|
| A 101  |       | Fee       | 42.95 |
| A 101 E–1 | Easements |        | .83   |
| A 101 E–5 |       | "         | 1.16  |
| A 101 E–6 |       | "         | .89   |
|        |       |           | 45.83 |

These properties are part of an extremely attractive area of the North Shore of Long Island. The country is somewhat wooded, and rolling; many substantial dwellings have been erected on extended acreage, with the result that the essential characteristics of the terrain have been retained. In recent times however the Village of Brookville has zoned the area here involved to two acre plots for residential purposes, and such is the present aspect of development. This means that improvements consist of dwellings costing from $50,000 upward in the vicinity of the affected properties.

With an understanding of the kind of property here involved, thus imperfectly summarized, it is now required to deal with the ever-difficult question of the so-called fair market value of that which has been taken by the Government.

At the time of taking, no plans for the development of either the Chase or Froehlich properties for sale in two acre parcels had been undertaken or perfected; however, as to the former, the subject was present in the minds of the owners to such an extent that borings were made and consultations with competent advisers had been initiated just prior to the date of the order for possession. It is clear also, and uncontested, that the best available and most

profitable use of these parcels was for such development, and the absence of formal planning to that end is of no present consequence.

The highest point on the Chase property is that taken in fee (A 100) which has an elevation of about 300 feet. The configuration of the land gives rise to a special consideration urged as an element of value, which does not apply to the Froehlich property, and thus it becomes necessary as well as convenient, to consider them separately.

### Chase property

The best showing of these damage parcels is on Chase Exs. B and N—a map without which it is scarcely possible to visualize the peculiar interrelationships of the damage parcels, with the remaining part of the Chase property not taken in the proceeding.

It will be seen that the damage parcels are all interior, and have no road frontage, with these exceptions: A 100 E–2 extends about 130 (E. & O. E.) feet on Cedar Swamp Road. It is triangular in shape and its sides extending westerly, converge so as to meet at the southeast corner of A 100.

A 100 E–1. This irregular shaped parcel has a broken line frontage of from 100 to 150 feet on a private road, known as the Gavin Road.

Damage parcel A 100 (the fee taking) is the site of the control element of the installation, and is the highest part of the Chase property. It is called a hill and as stated, the elevation is about 300 feet. Its northeasterly side rises abruptly from Cedar Swamp Road, so much so that if the Government had not taken the property, and a scheme of development into two acre residential plots had been put into effect, a certain amount of levelling of this comparative eminence, and other adjacent rises of lesser height, would have been required, in order to render the entire 140 acres suitable for coherent development. It is not feasible however to state an approximate total of the cubic yards thus to be removed, for much would depend upon the vision of the developing agent concerning the preservation of convenient and attractive contours, that is a configuration of the terrain which would be likely to appeal to prospective purchasers of building sites; some persons might wish to build on a different level from that of adjoining ownership.

The foregoing is stated by way of introduction to a topic much discussed in the Chase briefs, and which was the subject of considerable testimony at the trial, namely the extent to which the presence of sand and gravel on this property enters into the question of fair value, since apparently the process of development is envisioned by the Chase interests as a source of profit through the sale of those commodities to outside purchasers.

If the argument is understood, it does not assume the guise of urging that the 140 acres should be appraised as though it were a commercial sand and gravel deposit which was operated, or could be operated as such, and that the acquisition by the Government deprived the owners of property devoted to such an enterprise. If that were the argument, it would be without support in the evidence.

It seems rather that the Court is urged to consider the abundant presence of sand and gravel to constitute an element of value, which enters into the availability of the property for development according to the needs of the conceded highest and best use. Stated in that way, there is plausibility in the argument. The difficulty however which it presents, is a practical one. Assuming that an excess of sand and gravel resulting from the partial removal of certain rises in the surface of the ground, and not required to fill hollows, were to be on hand during or at the completion of the operation, which would be available to an outside purchaser, it is evident that profit arising from the sale of two acre plots, would be thereby enhanced to the developer. But the extent to which that would affect the purchase price that he would willingly pay for the 140 acres, is so much a matter of conjecture, as to elude the effort to state it in terms of

dollars in formulating this judgment. It is however recognized as an element of some value in computing the final figures. Beyond that this Court is unable to go into the realm of speculation.

A mere mathematical calculation that a large number of cubic yards of sand and gravel at 25 cents would yield a certain figure, not tied into an approved and perfected plan, merely suggests a theory which might or might not prove to be feasible in actual operation.

■ Sight has not been lost of the contention that as to the untaken portion of the Chase property—some 116 acres—the development which perhaps would have ensued, has been rendered impossible of accomplishment.

All that the witnesses say on this subject fails to establish as a rational conclusion that the property which was not taken could not have been developed into a considerable number of two acre building plots to which access could have been had by a road built adjacent to the northerly line of the Chase acres.

It is true that the construction of such a road would have involved engineering skill, but if the will were present to solve the problems, the result would have been rewarding to a developer.

This comment somewhat trenches upon the subject of severance damages, which will be reached in due course.

Turning now to the question of expert opinion of the fair and reasonable market value per acre, the Chase witnesses ascribed $3,500 to what they termed the grading benefits (sale of sand and gravel), and $2,750.00 to the remaining or strictly land values, or a total of $6,500 per acre, acquired in 1952 for $750 per acre.

The Government appraiser testified to a value of $1,000 an acre.

■ The sales referred to by the witnesses for both sides are informing, but not controlling since the various properties differ in size, topography and general characteristics from the Chase property.

■ Nor does it seem that reliance should be had upon the purchase price paid for the latter in 1952 of $750 per acre. During the two year interval that elapsed until the taking over, there was opportunity for a considerable increase in value and it is the belief of this Court that such indeed took place. Not however that the acquisition by the Government transformed the type of acreage which has been described, into a kind of bonanza, largely consisting of marketable sand and gravel.

Considering the Hutton, House of the Year, Inc., and the Meadowood Corp. sales as fairly indicative of market values in general, on December 21, 1954—the date agreed upon for valuation purposes in this case—and having in mind the remoteness of much of the Chase property from road frontage, and the element of value heretofore discussed, it is the reasoned conclusion and finding of this Court that the fair and reasonable value of the Chase 140 acres on the day stated, was $2,150 per acre.

This means as applied to these damage parcels that direct damage is thus computed:

| | |
|---|---|
| A 100 | $15,007.00 |
| A 100 E–1 | 2,042.50 |
| A 100 E–2 | 2,816.50 |
| Complete taking conceded. | |
| As to A 100 E–3 | 3,345.40 |
| A 100 E–4 | 2,743.40 |

Obstruction easements, the important element of which restricts buildings, etc. to a height of 38 feet.

This is deemed to constitute a 20% taking.

| | |
|---|---|
| Total | $25,954.80 |

■ The question of severance damage, namely the amount by which the value of the remaining acreage has been diminished as a result of the taking above stated, is the most difficult aspect of the problem which the controversy presents.

It will be seen by examination of Chase Exhibits B and N, that Damage Parcel A 100 serves almost the office of a stopper in the neck of a container having upper and lower elements; it effectually

closes all but 100 feet of the space between the northerly side of this parcel and the northerly boundary of the untaken property at the nearest point of separation. As stated above, this is ample to accommodate a road giving access to the acreage lying generally to the southwest of this damage parcel. The map (Exhibit N) shows Damage Parcels A 100 E–3 and A 100 E–4, but the visual impression is somewhat misleading; they are merely subject to the obstruction easement created to preserve intact an unobstructed plane in the air, at the height of 38 feet above the ground, for unimpeded passage of radar impulses at such a minimum level.

Residential construction does not extend vertically beyond 35 feet, according to the uncontradicted testimony, and thus for all practical purposes of use and occupancy, these two damage parcels do not diminish the area of the untaken acreage abutting damage parcel A 100, as shown on the map.

The reason incidentally for the 20% taking deemed to be proper as to these parcels, was perhaps a too generous allowance for the recurring cost of trimming trees which must be maintained at the restricted level; and for the querulous response of the legal mind to the mere presence of such an unsubstantial cloud upon title.

As to A 100 E–3, a part of course can be availed of for the construction of the access road to which reference has been made.

The rest of this Cedar Swamp Road frontage, even though bisected by A 100 E–2, is probably affected as to marketability by the retention of the 300 foot hill which A 100 requires, but the case is lacking in convincing evidence on the subject.

Apart from the theoretical views of the defendants' witnesses concerning the fatal effect upon values of the so-called frustration by the Government of what might have evolved into an acceptable plan of development, there is nothing tangible upon which to compute severance damages. Such as there can be deemed to be present is manifest only in the Cedar Swamp Road portion of the container (or upper part of the dumbbell as the briefs call it), and not in the rear or southwesterly lower portion of the property. Whatever of access thereto via the Gavin Road was legally permissible prior to the taking, has not been adversely affected.

The mere presence of the control element of this military reservation scarcely affects desirability for two acre residential plots, lying southwesterly of Damage Parcel 100 A, even though there is an attendant visitation to the control unit by the guests of those in the Service who are there stationed. The testimony is that the personnel comprise the best type of servicemen; this was confirmed by the personal observation of the Court when the property was inspected.

There is no present element of damage to residents of property adjacent to the control station. If hostilities should occur, it would of course be an object of enemy attention, as would the airplane plants on Long Island, and other not too distant places that could be mentioned. In such circumstances, the market value of the Chase property on December 21, 1954 would not be of great moment.

Of the untaken portion of the 140 acres (116 acres or so), it is my opinion that not to exceed one-third, or say 37 acres, constituting the section which is adjacent to Damage Parcel A 100, suffered a diminution in value as a result of the taking; and that this is estimated at 12% thereof. Stated in figures, the severance damage is computed as follows:

37 acres, fair market value December 21, 1954, at $2150.00 . . $79,550.00,
12% of which is . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ 9,546.00.

    It is therefore found that the total award to the owners of the Chase property is . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $35,500.80, made up of

$25,954.80 direct damage, and
9,546.00 severance damage.

## Froehlich property

As stated above, there are about 276 acres in this property, lying to the west of the Brookville Jericho Highway and easterly of the Cedar Swamp Road; it has no frontage on the former, but access thereto is provided by damage parcel A 101 E–1. As stated above, the damage parcels are:

|  |  | Acres |
|---|---|---|
| A 100 | Fee | 42.95 |
| A 101 E–1 | Easement | .83 |
| A 101 E–5 | " | 1.16 |
| A 101 E–6 | " | .89 |

The first named may be visualized as including a prolongation or extension of the triangle constituting Chase Damage Parcel A 100 E–2 as projected beyond Cedar Swamp Road. That entire triangle is entirely cleared, so that the launching unit which occupies A 101 is visually in line with the control unit on the Chase property, but separated therefrom by Cedar Swamp Road, and Froehlich property lying easterly on that road but which was not acquired in any respect by the Government.

Obviously the two elements of the guided missile installation are maintained and operated as one unit.

The Froehlich property is relatively but not absolutely flat, and presents no such complications in respect to the fair market value on the agreed date, as have been somewhat portrayed with reference to the Chase property.

It will be convenient to consult Froehlich Exhibit E for an understanding of the nature and location of the premises.

Damage Parcel A 101 E–1 (easement) is conceded to involve a complete taking.

The Froehlich expert testimony, largely based upon the same sales as were referred to in the Chase case, accorded to this property a value of $3,000 an acre. The Government expert stated it to be his opinion that the figure should be $1,500. It seems that the latter has given too much weight to the purchase price paid by Froehlich in 1950 of about $600 per acre, which included some buildings.

As a result of viewing the property, it is the opinion of the Court that for purposes of the development agreed upon as the best available use, the Froehlich acreage possessed a higher value on the agreed date, than the Chase property. It seems again that the Meadowood Corporation purchase (title closing December 21, 1954) is informing as to value.

That transaction included a dwelling and so it is impossible to allocate the price of $2,511 per acre between the land and buildings. The testimony as a whole leads this Court to the conclusion that the fair market value of the Froehlich property was $2,250 per acre on the agreed date, and it is so found. Thus

| A 101 | 42.95 acres |
|---|---|
| A 101 E–1 | .83 acres |

43.78 acres at $2,250.00 equals $98,505.00.

As to A 101 E–5: This is a partial taking, meaning a line of sight easement (i. e. obstruction) as to which the experts differ in the percentage of actual taking. As in the Chase case, the figure of 20% is adopted

The result is: 1.16 acres at $2,250.00 is $2,610.00 of which 20% equals 522.00

As to A 101 E–6: This is described as a safety easement, namely maintenance of a safety area which is so stringent that I find it to amount to a 90% taking, which cannot be far wrong since the Government concedes an 80% appropriation.

The computation is .89 of an acre at $2,250.00 is $2,002.-50, of which 90% equals $ 1,802.25.

The Froehlich claim for severance damage is based largely upon the presence of the launching unit upon Damage Parcel A 101, and the testimony is that in connection with it there are necessarily maintained in underground storage, munitions and supplies which would be called into use if belligerent occasion should so require. For obvious reasons the precise facts could not be disclosed, but the showing as just indicated is not contested by the Government.

That such conditions embody a potential hazard to adjacent premises seems to be too clear for discussion. Indeed the Government expert has erected a theoretical peripheral zone 400 feet deep around A 101 within which he concedes a 40% diminution in fair market value as the result of the taking. The defendants' expert depicts a space of twice the size and estimates a 30% loss in market value in that area.

He also adds a 20% depreciation in the improvements on property not taken, which he attributes to the taking.

In the first place it is to be noted that the Government expert's computation embraced in his 400 foot zone, stated in the record to be 21.3 acres, actually is 45.3 acres. The statement to this effect in the Froehlich brief is fortified by a map prepared by an engineer to demonstrate the second figure. It is not challenged in the Reply Brief of the Government, and will hence be accepted for present purposes. The right is reserved to the Government to demonstrate error in this respect by reopening the case to take testimony if deemed necessary.

The Government expert's testimony is accepted as to the probable adequacy of a 400 foot zone, and a severance damage therein to be computed at 40%.

The computation is 45.3 acres at $2,250.00 or $101,925.00, of which 40% equals $40,770.00.

The testimony as to depreciation in the buildings on property not taken is too speculative to be allowed. The same applies to severance damage estimated beyond the 400 foot periphery.

It is therefore found that the total award to the defendant Froehlich is $141,599.25

made up of $100,829.25 direct taking, and $ 40,770.00 severance damage.

Settle judgment.

Settle judgment.