UNITED STATES of America,
Petitioner-Plaintiff, Appellee,

v.

Margaret J. CHASE et al., Defendants-
Appellants.

No. 327, Docket 24898.

United States Court of Appeals
Second Circuit.

Argued June 13, 1958.

Decided Nov. 3, 1958.

Vollmer, Wildermuth & McCarty, Brooklyn, N. Y. (William P. Palmer, New York City, George C. Wildermuth, Charles M. McCarty, Brooklyn, N. Y., on the brief), for defendants-appellants Joseph J. Dowling and William M. Greve.

Edward J. Ledogar, Jr., New York, N. Y., for defendant-appellant Margaret J. Chase.

Perry W. Morton, Asst. Atty. Gen., Harry T. Dolan, Sp. Asst. to the Atty. Gen., Roger P. Marquis, S. Billingsley Hill, Attys., Dept. of Justice, Washington, D. C., for the United States, plaintiff-appellee.

Before HINCKS and WATERMAN, Circuit Judges, and RYAN, District Judge.

RYAN, District Judge.

The owners of condemned realty appeal from a judgment rendered after trial in the District Court, without a jury, awarding compensation of $35,500.80 for a Government taking in fee or of easements in five separate tracts affecting 23.40 acres lying within an area of 139.895 acres of unimproved and undeveloped land, described as the "Chase property" and fronting approximately 2800 feet on the westerly side of Cedar Swamp Road, Village of Brookville, Town of Oyster Bay, Nassau County, New York.

The question presented is the adequacy of the award. The following is a tabulation of the evaluations made of the direct and severance damage:

| Direct Damage— | Tract | Owners' Valuation | Government Valuation | Court's Valuation |
|---|---|---|---|---|
| | A-100 | $ 43,625.00 | $ 6,980.00 | $15,007.00 |
| | A-100-E-1 | 5,938.00 | 950.00 | 2,042.50 |
| | A-100-E-2 | 8,187.00 | 1,310.00 | 2,816.50 |
| | A-100-E-3 | 14,977.00 | 778.00 | 3,345.40 |
| | A-100-E-4 | 12,281.00 | 638.00 | 2,743.40 |
| | | $ 85,008.00 | $10,656.00 | $25,954.80 |
| Severance Damage | | 407,686.00 | 4,260.00 | 9,546.00 |
| Totals | | $492,694.00 | $14,916.00 | $35,500.80 |

Appellants contend that the trial court, in determining fair market value, erred in completely excluding the element of value arising from subsurface sand and gravel deposits, and that the portions of the award attributable to severance damage to the untaken acreage and to the "line of sight" easements were not just compensation.

The taking was for the purpose of erecting and maintaining on the Chase property the control site of a United States Army "Nike" missile installation. The suit was filed on May 25, 1954 to acquire property for an entire "Nike" installation; the tracts taken for the firing site are located about 1000 yards away on the "Froelich property." The owners of these firing site tracts have filed no appeal from the award granted to them.

The operations at this installation do not involve the actual launching of missiles; the site is a military reservation for the training of personnel in technical and practical incidents of warfare. This embraces the maintenance at the firing site, but not on the Chase property here involved, of ammunition and material that would be necessarily employed in the event of hostilities.

It was stipulated that December 21, 1954 was the effective date for valuation purposes. The trial judge viewed and inspected the property on November 1, 1956; as he noted, what he saw is not in the record but it enabled him to evaluate the evidence presented.

It is undisputed that the highest and best use to which the property taken might have been put, was for residential purposes. The property is located in an

extremely attractive area of the north shore of Long Island, zoned only for that use with a minimum requirement of two acres for each residential site. It is situated in a neighborhood of private dwellings ranging in price up to $60,000. It is rolling land, typical of the territory; it is partly wooded and partly open fields. It was entirely undeveloped and no plans for its development had been officially filed or approved. The appellants were not developers; the property had not been bought by them to develop, but rather as an investment to hold and to sell at a higher price, if possible. They contracted to buy the property on June 15, 1952 and took title in January, 1953 at $750.00 per acre, or a total of $103,000 for all 139.895 acres.

The boundary lines of the Chase property present a geometric figure somewhat similar to a lengthwise medial cross section of a dumbbell with the easterly broad end abutting on the westerly side of Cedar Swamp Road. This road as it runs past the property rises from 209 feet to 245 feet above sea level.

As one proceeds through the property west from this road, for a distance of about 200 to 250 feet, there is a slight rise in elevation above the road level; then the ground rises rapidly and abruptly so that, continuing west, the elevation reaches 323.5 feet above sea level in a distance of 100 feet. This hill or ridge running north and south through the property has a $33\frac{1}{3}°$ grade. It is the highest point on the property and, located at the handgrip of the geometric dumbbell, the narrowest strip. From the summit of the hill there is a gradual slope downward to an elevation of about 240 feet above sea level, and to the west of this point lies sloping and hilly terrain which carries on to the west boundary line. Roughly, the Chase property is of three types of terrain—the hill or ridge at the narrow point of the plot comprising about 38 acres; the gradual sloping land lying to the west of the hill comprising about 80 acres; and the comparatively level field to the east of the hill and bordering on Cedar Swamp Road

(excluding an approximately two-acre hill on the extreme northeast of the property) comprising about 20 acres.

The parts taken of the Chase property totaled 23.40 acres, and the taking was fee title to one tract and perpetual easements to four tracts.

Tract No. A-100 was taken in fee as the site for the installation of the radar and control equipment. It consists of 6.98 acres. The Government has erected on this parcel a radar tower with revolving screen and nine one-story buildings consisting of three barracks, a latrine, mess hall, orderly room, day room, generator building and a boiler house. The barracks, latrine and generator buildings are approximately 20 x 40 feet each; the mess hall 30 x 60 feet. The mess hall and latrine are of cinder block construction; the other buildings of prefabricated metal. The corps of men stationed at this "Nike" installation consists of 102 enlisted men and 7 officers; half are assigned to duties at the control sites and half at the launching site on the Froelich property. All have their meals at the mess hall on the control site; a 29-passenger bus is operated nine or ten times daily between the two locations.

This tract is located on the crest of the hill, at the highest point on the property. The trial court has found "that damage parcel A-100 serves almost the office of a stopper in the neck of a container having upper and lower elements"; that is, it occupies the major portion of the neck or grip of the geometric dumbbell of the Chase property. The court found, and the maps and surveys in evidence show, that "it effectually closes all but 100 feet of the space between the northerly side of this parcel and the northerly boundary of the untaken property at the nearest point of separation."

Tract A-100-E-1 is an easement taking in .95 acres for a road, for maintenance, repair and patrol of facilities and for "line of sight" or obstruction easements. It is conceded to be the equivalent of a fee taking. It provides a direct means of access to Tract A–100

at its southeasterly corner from Cedar Swamp Road via Gavin Road which lies adjacent to the southerly boundary of the subject premises at the easterly end thereof.

Tract A-100-E-2 is an easement taking (also conceded to be the equivalent of a fee taking) in 1.31 acres for utility lines, for maintenance, repair and patrol of utilities and also for "line of sight" easements. This taking, triangular in shape, runs from a point near the southeast corner of Tract A-100 directly through the acreage on Cedar Swamp Road, splitting the center of this frontage for a distance of about 135 feet.

Tracts A-100-E-3 and A-100-E-4 are takings of "line of sight" easements in 7.78 and 6.38 acres, respectively. These tracts are contiguous to Tract A-100, with E-3 bordering on the northerly and easterly boundaries of that tract, and E-4 on the southerly boundary. E-3 runs from Tract A-100 to a point 300 feet west of Cedar Swamp Road, and E-1 runs to within 400 feet west of that road.

At trial, appellants presented evidence to show that in February, 1954, prior to the taking, they had physical surveys made of a possible development of the property for residential use. They, at no time, intended to carry on this development program themselves, and plans of subdivision were never officially filed. Their apparent purpose was to acquaint themselves in detail with the development possibilities of the property and to offer it to a prospective purchaser in a more attractive package than just acreage. They hired a soils engineer to make test borings to determine the subsurface. Between February 25th and March 26th, 1954, he made 16 borings and these established the presence of a large amount of commercially usable sand, grit and gravel. There is in evidence a chart (Chase Ex. Z) showing the location of these borings and the sieve analysis from each hole. No boring was made in the westerly ball of the geometric dumbbell outline of the property, and no claim of subsurface sand and

gravel deposits in this area was made at trial. The presence of these deposits was uncontradicted by any Government witness.

In May or June, 1954, appellants permitted a private contractor to remove about 4500 cubic yards of material from the northeasterly corner of the property, for which he paid them 25 cents per cubic yard.

Appellants, in April, 1954, employed an engineering firm to prepare a topographical map of the property and at about the same time they engaged another engineering firm to prepare a proposed grading and development plan. Such plans were, in fact, prepared. The plans provided, after grading and interior roadways, for sixty residential sites of two or more acres each. The plans projected an entire removal of the 300 foot hill and proposed a grading off of the front 90 acres of the property west from Cedar Swamp Road at a gradual rise of 1% in grade to a contour of 250 feet elevation reaching to a point about two-thirds of the way toward the westerly boundary line of the property, from which point the smaller elevations and hills were to be left in their natural existing level. This proposed grading would have been a monumental undertaking. It would have entailed the removal of 4,835,000 cubic yards of material in place (which would increase approximately 10% when taken out of the ground). It would have also required the scraping off and stockpiling for later replacement of 200,000 cubic yards of topsoil, actually leaving 5,118,500 cubic yards for removal and sale. The appellants' witness described this as a six-year operation; we envision it as requiring 511,850 ten cubic yard truckloads of material; bulldozers, cranes and shovels and an enormous batching or screening plant with large areas for stockpiling, as well as a continuous stream of large consumers ready to purchase.

This sand and gravel had, according to appellants' expert, a market value of 25 cents per cubic yard in place on a

"run of bank" basis without any cost of removal to be borne by the owners. Thus computed, the return would see the accomplishment of the grading without cost and cash receipts over the six years of $1,279,625. This would seem to be the operation of a commercial sand and gravel pit. Transmuting these receipts from six years of sand and gravel removal and sale into "the amount that some investor or some developer would pay in excess for the property because that element was there," appellants' experts were of the opinion that these deposits enhanced the value of the 90 acres to be graded by $315,000 which was entirely lost by the taking.

■ We find, however, in the record no facts whatever to support the opinion of the appellants' experts that the taking caused recoverable damages of $315,000, or of any other sum, attributable to the loss of this "grading value." To be sure, there was testimony as to six developments, only two of which were in Long Island, resulting in surplus sand and gravel which had been sold at prices varying from 15¢ to $7.00 per cubic yard. But so far as appears, these were all operations involving sales on a unit basis: the purchaser extracted the material and paid for what he actually took. In none, so far as appears, did the purchaser obligate himself to remove from a tract comparable to the subject premises, and presently to pay for, an amount of sand and gravel comparable to the five million cubic yards estimated to lie in the subject premises or to leave the premises at prescribed slopes and elevations. Neither in connection with these six operations nor elsewhere in the record were facts shown which might serve as the basis of an opinion as to the extent to which the present value of the subject premises in its natural state on the critical date was enhanced by an estimate of the value of the removable sand and gravel which under a plan for its development would be available for sale. The opinion that the value of the subject tract, apart from its grading value, was enhanced by $315,000 appears to have

been given without any basis of fact and was rightly rejected by the judge below. State of Washington v. United States, 9 Cir., 214 F.2d 33, certiorari denied 348 U.S. 862, 75 S.Ct. 86, 99 L.Ed. 679; Westchester County Park Commission v. United States, 2 Cir., 143 F.2d 688, 693; United States v. 102.93 Acres, D.C., 154 F.Supp. 258, 261–262, affirmed sub nom. United States v. Fox, 2 Cir., 257 F.2d 805.

■ Moreover, the judge below was not required to accept the appellants' opinion evidence that the *entire* grading value was lost because of the taking. Although, to be sure, the appellants may not legally disturb the elevation of the property taken in fee, the maps showing the natural contours and the plan elevations made it undisputably plain that from portions of the tract, exclusive of those taken in fee and not to be disturbed, a vast amount of material was still removable and available for sale. Under the appellants' theory that the basic land value of the tract was enhanced by the amount of the removable sand and gravel, the burden was on the appellants, as the cases above cited held, to show to what extent the amount of material available for sale was reduced by the taking. We think that the appellants did not sustain the burden as to this item merely by providing contour maps of the tract from which, possibly, an engineer could have made the elaborate computations necessary.

■ The court below found that the fair and reasonable value of the 140 acres was $2,150 per acre and on this basis he computed the direct and severance damages resulting from the taking. There is some indication in his opinion that this valuation included some allowance, to an extent not disclosed, for the loss of grading value. But even if this factor was wholly excluded from his valuation, we hold that his valuation was not erroneous. For as we have shown above, the evidence did not require—indeed it did not warrant—a finding as to the extent to which the value of the tract was enhanced, and severance dam-

ages were sustained, by such a factor. Our holding is not inconsistent with the cases cited by the appellants holding that the mineral content of land is a proper element of value. The judge below clearly recognized that principle of valuation—as do we—and the appellants make no complaint here of evidence wrongly excluded. Their claim on this point falls because on this record the trial judge came to the proper conclusion that he could not enter the area of conjecture or realm of speculation in fixing a dollar figure on the grading value lost.

It was the testimony of appellants' expert that because of the outline of the Chase property—dumbbell in character—"the only way for a road to get from the front to the back of the property was through the center of the narrowest portion with a turn around at either end," and that the possibility of this plan was prevented by the Government taking of Tract A-100. He further testified that the 100 foot strip of untaken land remaining in the narrow point of the property to the south of Tract A-100 was "one of the worst grades or the steepest grades of the property." He ventured the opinion (although not an engineer) that to get through that 100 foot strip to meet the grade of the rear property, a road with a retaining wall on either side would have to be built.

It is appellants' contention that the trial court failed to distinguish between access and usable access, and that some award should have been made for severance damage due to loss of usable access. The appellants' experts attributed 20% severance damage to the westerly 84½ acres for such loss of access; the trial court made no award on this claim of damage.

Although the trial court recognized that the taking in fee of Tract A-100 "serves almost the office of a stopper in the neck of a container having upper and lower elements" (that is, that it operated to almost completely separate and segregate approximately 32 acres of untaken land fronting on Cedar Swamp Road from the westerly 84.5 acres

also untaken), it found that the "100 feet of the space between the northerly side of this parcel and the northerly boundary of the untaken property at the nearest point of separation" was "ample to accommodate a road giving access to the acreage lying generally to the southwest of this damage parcel." There is evidence to sustain this finding.

■ The record does show that the Chase property had use easements in Gavin Road, which is contiguous on the south to the easterly front acreage and runs up to the point where Tract A-100-E-1 is situated. With respect to the use of this road as a means of access, the trial court has found that "whatever of access thereto (i.e., the westerly 84.5 acres via the Gavin Road) was legally permissible prior to the taking, has not been adversely affected," and this the record shows to be the fact. Furthermore, the trial judge, and not this court, made a personal inspection of the property. He was able, through personal observation, to see and understand the actual facts on access to the rear acreage before and after the taking. We certainly cannot say that a road through Tract A-100 was the only usable access before the taking, and the record sustains a finding that access on either side of Tract A-100 was just as available after the taking as before. It cannot be said that a denial of an award for loss of access was clearly erroneous.

It is also appellants' contention that a total of 90 acres of the untaken property suffered severance or consequential damage by reason of the proximity of the government installation. This damage flowed, according to appellants' expert, from "an invasion of privacy" of this residential property due to the presence of the military installation and to traffic to and from it by the personnel and others; and because the bareness of trees and shrubbery, not only at the operational site but also in the area of the four easement tracts, would leave the installation "standing out in the residential area as a public installation"; and because the installation made the im-

mediate area "a prime target of attack" in the event of warfare—"a disturbing influence to a community of the quality of the Brookville community." It was on this basis that appellants claimed a severance damage of $76,455 computed at a 20% depreciation of the before-taking value on 90 acres.

 The trial court, recognizing that an award should be made on this claim of severance damage, found that only the 37 acres of the untaken 116 acres adjacent to Tract A-100 suffered a diminution in value as a result of the taking, and this it fixed at 12%. We read this award as being the amount fixed as severance damage due to the proximity of the entire "Nike" installation. The trial court found that "the mere presence of the control element of this military reservation scarcely affects desirability for two-acre residential plots, lying southwesterly of Damage Parcel 100-A (sic), even though there is an attendant visitation to the control unit by the guests of those in the Service who are there stationed."

The evaluation of this element of claimed severance damage rested with the trial judge. We may not say that his evaluation, even though it may differ from our own, was error. It is not required that we agree with his findings. "It is sufficient for us that we cannot, upon the evidence as a whole, determine that the finding was clearly erroneous as not within the evidence." Seale v. United States, 5 Cir., 1957, 243 F.2d 145, 146; Phillips v. United States, 2 Cir., 1945, 148 F.2d 714. The trial judge personally viewed the property; there is support for the amount of this award; it must be accepted by us on this appeal.

Then, we consider appellants' objections to the adequacy of the awards for the taking of the line of sight easements in Tracts A-100-E-3 and A-100-E-4. The appellants' experts appraised these at 70% of the value of the 14.16 acres involved; the Government witness found the value of these tracts depreciated by only 10%; the trial court

found a depreciation of 20%. The easements taken in these two tracts subject these tracts "to the obstruction easement created to preserve intact an unobstructed plane in the air, at a height of 38 feet above the ground, for unimpeded passage of radar impulses at such a minimum level." The easements do not limit the height of residential construction under 35 feet, and the trial court has found that construction in the locality does not extend vertically above this. We agree that these easements will not seriously interfere with typical housing and improvements on these tracts. These awards were not clearly erroneous, and may not be disturbed on this appeal.

We find neither merit nor substance to appellants' objections to the failure of the trial court to make any award for loss of plottage.

The judgment is affirmed.