**UNITED STATES of America, Petitioner-Plaintiff,**

v.

**63.04 ACRES OF LAND, MORE OR LESS, AT LIDO BEACH, near the City of Long Beach, Town of Hempstead, County of Nassau, State of NEW YORK, and Irving A. Nemerov et al., Defendants.**

United States District Court
E. D. New York.

June 18, 1956.

Harry T. Dolan, Sp. Asst. to Atty. Gen. of the United States, for petitioner-plaintiff.

Samuel Goldstein & Sons, New York City, for Nassau-Lido Corp.

BYERS, District Judge.

This branch of the above-entitled proceeding has to do with a parcel of unimproved land consisting of 4.56 acres originally part of a tract of 70.84 acres of tidal marsh land in Lido Beach, immediately east of Long Beach, Nassau County.

The 70.84 acre parcel was a portion of property that had been taken by the Government for war-time uses, and in July of 1954 was offered for sale by sealed bids; advertising thereof was in the metropolitan and local newspapers and 450 invitations were solicited by mail.

Eighteen bids were received, the highest being that of the defendants in the sum of $753,000, or roughly $10,630 per acre; title passed on January 25th of 1955.

The Government started this proceeding to acquire the acreage stated in the above caption on July 2, 1954; the complaint was amended however on August 29, 1955, to add the 4.56 acres first above referred to; on August 30th an order was entered granting the Government possession, which means that fixing the fair value thereof on that date is the object of this branch of the case.

The subject property lies immediately south of a Government military site used in connection with the guided missile program; the effect of the taking was to project the southerly line thereof to the extent of about 205 feet, for a distance of about 1,050 feet running easterly. This means that the 4.56 acres was carved out of the northwesterly section of the 70.84 acre tract, quite near to Blackheath Road but distant therefrom about 65 feet. It has no road frontage whatever.

The configuration is roughly that of a trapezoid, having 1,050 feet on its northerly, and 869 feet on its southerly sides, 205 feet on the westerly side, and being irregularly diagonal for about 256 feet on the easterly boundary. Why it was not originally excluded from the sale of the 70.84 acres has not been confided to the court.

The larger tract is said to have been part of what was once the Lido Golf Course, which probably accounts for the fact that this 4.56 acres, known as Tract A–110, is composed of 3.34 acres of dry, sandy land, and 1.22 acres is covered by a lagoon. Such an element is understandable in a golf course—and is even commendable if one has safely carried the water hazard. The present bearing of this physical condition however is of serious consequence, when the court is requested by defendant to fix the fair value or just compensation for this damage parcel, on the theory that it should be deemed to have been converted into 29 building plots out of a total of 311, as designed to be comprehended in the original area of the 70.84 acres.

The defendant's theory is thus: That the character of the property should not be valued at what it was on August 30, 1955 (and still is), but rather on what it could be converted into according to tentative plans which have been formulated to that end, but which on the day of taking existed only on paper.

The analogy is not complete, but the argument is somewhat like an assertion that raw wool from the shearer should be valued in terms of a finished product that has been spun into yarn and woven into bolts of cloth ready for use in that condition.

Manifestly the burden of persuasion, (Westchester County Park Commission v. United States, 2 Cir., 143 F.2d 688), of the validity of that theory is not inconsiderable.

The relevant facts are not in dispute which renders it unnecessary to tabulate them as findings.

The 70.84 acre tract had been used as part of a Naval training station and later by the Veterans' Administration as an emergency housing development. That use involved the erection of residential facilities, and the building of concrete roads and other appropriate improvements which need not be recapitulated. When the property was offered for sale in 1954 by the Government agency in charge, it was manifest that the best available use of the said 70.84 acre tract would be for residential development in keeping with adjacent properties on which there had been and were being erected high-class houses of the $25,000 class or more.

A purpose to acquire this acreage for that use must be attributed to any informed purchaser and such indeed was this defendant.

From the physical character of the property it was manifest that no such purpose could be realized unless all existing structures should be demolished, many if not all of the concrete roadways removed, and other similar measures taken to create a coherent and adaptable parcel of land, capable of allocation into building plots that should accord with existing zoning regulations.

This means that the potential value for development is not a new thing but necessarily entered into and controlled the bid price which worked out to the average of about $10,630 per acre, as has been stated.

The bald question is then presented of whether the value of these 4.56 acres for such developmental purposes, enhanced between January 25, 1955 and August 30th; and if so, how much.

Obviously the $10,630 per acre average price was much too high for that portion included in this damage parcel, which lay more than 25 per cent under water, but it is accepted as the necessary basis for present computation, since it is not feasible to attempt to allocate the purchase price otherwise.

No nearer approach to the willing buyer and willing seller relation than is shown here can be imagined. The Government was willing to sell, and broadly so advertised, and the defendant was willing to buy or would not have submitted the bid which was accepted.

The defendant promptly prepared a topographical survey of the property so acquired, which is shown on the map, Defendants' Ex. A, completed February 17, 1955. Thereafter the property was subdivided mapwise into building plots, according to a scheme which indicated projected roadways, frontages, and other details, according to a subdivision map, Defendants' Ex. C, which was filed with the Nassau County Planning Commission for approval on April 26, 1955. The plan has not thus far been approved and therefore presents but a tentative scheme as of the date of this trial.

Some deficiencies in the plan were pointed out in the testimony of the Government witness Brons, which has not been contradicted. These involved test borings, storm and sanitary sewers, grades, the widening of Lido Boulevard by 20 feet, and other highly practical matters.

It is unnecessary to discuss the respects in which it is apparent that the plan will have to undergo important revision before it can assume a final aspect and gain the approval of the county authorities; that is, before the raw 4.56 acreage of this damage parcel could be valued as 29 building plots. Cf. United States v. Certain Parcels, etc., 5 Cir., 149 F.2d 81.

The defendants' witness Kearns accepted estimated figures as to all elements of the cost of converting the 70.84 acres into 311 building plots, and the plan itself, so naturally he testified that 29 had been lost by this taking.

It is not necessary to quarrel with the logic of the Kearns figures, once the basic assumption has been accepted that all elements of cost are proper and that all required provisions have been made to insure the result that the subdivision map portrays. The trouble is that on August 30, 1955, no such condition existed, nor has it yet been brought about. Between January 25, 1955 and the succeeding August 30th the only actual work that had been done—aside from surveys and the making of maps—was the demolition of barracks, none of which was on this parcel A-110.

It results therefore that as of the date of taking, this parcel was 4.56 acres of interior property, 25 per cent of which was under water, not 29 building plots according to a tentative scheme of development.

Any such enhancement in value over the purchase price of $10,630 per acre during the eight months that intervened between the acquisition of title by the

defendant, and its vesting in the Government, as may be visualized could result from:

(a) The lapse of time in an area in which the value of home sites according to neighborhood standards was on the increase;

(b) The fact that this property was owned by interests shown to possess the skill to effect such a development as has been projected;

(c) The actual start of the process of physical change, and the conduct of surveys and studies appropriate to the accomplishment of the ultimate purpose.

It is the opinion presently held, that these intangible but important conditions have been fairly demonstrated, and that an enhancement over the average price of $10,630 per acre to the extent of ten per cent thereof must be deemed to have been so created, during the eight months that elapsed between the dates named.

The one sale relied upon by both Kearns and Brons to vindicate their respective views as to the values involved, is not thought to have concerned comparable property, since none of that was under water, and none of this has a road frontage.

The enhancement as computed above is at a level rate, although the 1.22 acres of this damage parcel which lie under water could not of course enhance in value at all while still submerged; also, the evidence on the subject of the actual amount of fill that will be required to bring this part up to the eight foot prevailing level, is less than convincing.

Nor is it more than conjecture that once the fill is in place, it can sustain any structure without the necessity for building retaining walls.

However, since the per acre cost has been established, the enhancement must be similarly computed, if logic is to have its place in the process.

Brons testified that in his opinion the ✓onsequence of the taking of this damage parcel has been to reduce the number of possible building plots in the strip of Blackheath Road frontage of the defendants' property along the westerly line of A–110, by one (since the strip left is of but 65 feet in depth); this loss he places at the sum of $5,000. His testimony on this is convincing.

Judgment is therefore directed to the effect,

That the fair and reasonable value of the 4.56 acres constituting damage parcel A–110 on August 30, 1955, was ......................$53,320.08
That the defendant suffered additional damage in consequence of the taking, in the sum of ..................... 5,000.00

or a total of ...............$58,320.08

just compensation.

Settle order.