**UNITED STATES of America,**
**Petitioner-Plaintiff,**

v.

**765.56 ACRES OF LAND, MORE OR LESS, IN THE TOWN OF SOUTH-AMPTON,** County of Suffolk, State of New York, and Salvatore Aleci, et al., Defendants. Tracts 211, 212, 216, 218, and 223.

**No. C. P. 108.**

United States District Court
E. D. New York.

June 2, 1959.

1

Harry T. Dolan, Sp. Asst. to the Atty. Gen., for petitioner-plaintiff.

Albert H. Buschmann, Jamaica, for defendant Eastern Suffolk Concrete & Asphalt Corp.

Sherman & Goldring, New York City, Julius Winn (of counsel), New York City, for defendant Glanat Realty Corp.

INCH, District Judge.

## Findings of Fact and Conclusions of Law

### History of Proceedings

This condemnation action was instituted on April 30, 1957, to acquire the specific easements hereinafter described. On May 1, 1957 an order of possession of said easements was entered and which date, it is not disputed, constitutes the date of taking and valuation of the easements appropriated. United States v. Dow, 1958, 357 U.S. 17, 78 S.Ct. 1039, 2 L.Ed.2d 1109. As originally instituted, the easements taken involved some 39 separate parcels, comprising an aggregate area of approximately 765.56 acres.

On July 24, 1958, after trial, the court filed its decision fixing the compensation to be paid for the easements taken as to ten parcels. United States v. 765.56 acres, D.C.E.D.N.Y.1958, 164 F.Supp. 942. On January 5, 1959, this court after trial filed its findings of fact and conclusions of law fixing the just compensation for the easements taken as to four additional parcels. Appropriate judgments fixing compensation in accordance with said decision and said findings of fact and conclusions of law were duly entered on August 13, 1958 and January 20, 1959 respectively.

The just compensation for the easements taken as to the remaining parcels, with the exception of those now under consideration, has been fixed and determined by stipulation of the parties and orders of court entered thereon. There remains, therefore, for consideration and determination by the court, the fair value and just compensation which should be paid by the United States for the easements taken insofar as they affect the five above-identified parcels as of May 1, 1957, the date of taking.

### Question Presented

■ The question presented throughout this action and now presented as to the remaining undisposed of parcels is essentially the loss or diminution in the fair market value of the land which has

resulted or flows from the nature, character and extent of the estates or interests appropriated by the Government. Differently stated, the just compensation should approximate the difference in the fair market value of the land immediately before and after the easements were imposed by the taking. United States v. 765.56 acres, supra; United States v. 329.05 acres, D.C.S.D.N.Y.1957, 156 F.Supp. 67; United States v. 48.10 acres, D.C.S.D.N.Y.1956, 144 F.Supp. 258; United States v. 72.35 acres, D.C.E.D.N. Y.1957, 150 F.Supp. 271; United States v. 26.07 acres, D.C.E.D.N.Y.1954, 126 F.Supp. 374; 293.080 acres of Land More or Less, Situate in Westmoreland County, Com. of Pa. v. United States, D.C.W.D.Penn.1959, 169 F.Supp. 305.

Nature of Easements Appropriated

(Tracts 211, 212, 216, 218, and 223)

Perpetual and assignable easements and temporary easements for the establishment and maintenance of clearance areas or zones in and over the above identified tracts, consisting of the following rights:

(1) The continuing perpetual right to remove, to raze, to destroy and to prohibit the future construction of buildings or portions thereof, other structures or portions thereof, land, hills, embankments of earth and other materials, infringing upon, extending into or extending above the approach glide surface and/or transitional surface as described in the complaint in condemnation.

(2) The continuing right to top, to cut to ground level, to remove, and to prohibit the growth of trees, bushes, shrubs, or any other perennial growth or undergrowth infringing upon, extending into, extending above, or which could in the future infringe upon, extend into, or extend above the approach glide surface and/or transitional surface as described in the complaint in condemnation.

(3) The right of ingress to, egress from, and passage on the above tracts of land for the purpose of exercising the rights hereinabove set forth.

(4) The temporary right, to continue in effect until July 31, 1958, of access and passage on the above tracts of land for purposes of access to adjoining tracts, including the right to construct temporary roads for such purposes.

(5) Reserving, however, to the landowners, their heirs, executors, administrators, successors and assigns, all right, title, interest and privileges, as may be enjoyed without interference with or abridgment of the rights hereby granted.

(6) Subject to existing easements for public roads, highways and streets, for public utilities and railroads.

Generally speaking, the purpose of such easements is to clear and keep clear from any and all obstructions of whatsoever character, the airspace within the approach zone to runways or airstrips adjacent to airfields and to eliminate the flight hazards which might be created by obstructions of any character extending into the restricted airspace constituting the glide angle plane for such runways. In this instance, the obstruction easements taken had relation to the approach zone to the northeast-southwest runway of the Suffolk County Air Force Base, which is located adjacent to and adjoining the easement area on the southwest. The glide angle plane is a trapezoidal plane extending over the runway approach zone, starting from a line 1500 feet long at its base and commencing at a point 1000 feet northeast of the end of the runway. The base of the trapezoidal plane is 1500 feet wide or 750 feet on either side of the center line of the runway, if projected through the center of the 1000-foot clear zone which is a zone extending 1000 feet from the end of the actual runway and in this instance, in a northeasterly direction. The side lines of the planes are each about 10,000 feet long and extend outward from the base at designated angles, so that the plane grows broader as it proceeds outward from the base. The width of the side lines of the plane are approximately 4000 feet when they reach a distance of approximately 10,000 feet from the base. The base of the plane

slopes upward at a rate of one foot vertically for each 50 feet horizontally for a distance of 10,000 feet and reaches an elevation of 200 feet above the ground when it reaches its outward terminal point, starting at ground level at its base. (Govt.Exhs. 15, 16, 17)

### Type and Character of Land Under Consideration

The parcels under consideration here are all located in the Town of Southampton, Suffolk County, as is all of the land involved in this condemnation action and about six miles southeast of Riverhead, the county seat. The court has personally inspected and viewed the land involved in this action on two occasions, including the parcels under consideration, and also viewed this same property when it was the subject of a somewhat similar and comparable condemnation action in 1953. (United States v. 33.99 acres,—C.P. 91—not reported)—(Govt. Exh. 16) With the exception of Tracts 204, 205 and 206, previously disposed of and which involved tillable farmlands, all of the land, including the tracts now before the court, are the typical sandy, unimproved, scrub oak land found so abundantly in this area. The United States Department of Agriculture Soil Survey of Suffolk and Nassau Counties, New York, compiled in 1928 in cooperation with the Cornell University Agricultural Experiment Station and the accompanying maps of the area, classify all of the land under consideration as "Plymouth Sand". The parcels under consideration are located in about the center of an area of this type of soil classification, extending about 2½ miles from east to west and about 1½ miles from north to south. (Govt.Exh. 29) This soil type is described in the official Soil Survey above referred to as "identical in all respects with Plymouth loamy sand except in the presence of a surface soil consisting of sand, with too low a percentage of fine material to give a loamy feel. Plymouth sand occurs in rather extensive areas, the greater part of the south ridge and a large part of the south fluke being occupied by it.

Practically none of the land is under cultivation." (Govt.Exh. 29, pp. 26, 27; and attached map of the area with location of the subject parcels identified thereon).

None of the land under consideration had been cleared of natural scrub growth or used for any purpose other than a small area near the southerly boundary of Tracts 211 and 212, where prior to the taking of the easements, a relatively small area had been cleared and some earth removed. The contour of the land was highly irregular. The elevation of the land rose from 100 feet at the southerly boundary to a maximum elevation of approximately 230 feet in the center portion and then gradually descended to an elevation of 100 feet near the northerly boundary. (Govt.Exhs. 2, 21, 29)

Within the parcels under consideration there were seven hills which reached peak elevations of approximately 230 feet above mean sea level. (Govt.Exhs. 1, 2, 21, 29) The presence of these hills and their elevation with relationship to the glide angle plane established by the easements taken necessitated the excavation and removal of that part of the hilltops which intruded into the airspace restricted and prohibited by the easements from any obstructions which might constitute a hazard to the flight of aircraft taking off from or approaching the airstrip or main runway of the Suffolk County Air Force Base as extended and lengthened by the Government in 1957 and 1958. The right to remove these hills or earth obstructions was among the rights included in the easements taken.

The Suffolk County Air Force Base, which is located to the southwest of the easement area and contiguous thereto, is owned in part by the United States and in part by Suffolk County. The part owned by the County has been leased and used by the United States Air Force since about the year 1942. (Govt.Exh. 22) As originally constituted, the principal runway extending northeast-southwest, was approximately 5,000 feet long. In 1953 the Government extended the runway to the northeast some 2000 feet

and in connection with such extension, acquired by direct purchase and/or by condemnation, avigation easements over most of the area involved in the present action and including the parcels under consideration. (Govt.Exhs. 15, 16, 17, 22) The easements so acquired in 1953 and which encumbered this land at the time of taking of the present easements on May 1, 1957 were substantially identical with the easements now under consideration with the following exception: The 1953 easement granted to the Government not only the right to clear and keep clear the land from any obstructions, including the removal of soil, trees, etc., which intruded or extended into the airspace above the glide angle plane established by the easement, but also restricted and reserved such airspace above the glide angle plane "for the free and unobstructed flight of aircraft in, through and across the airspace above the glide angle plane". (Govt.Exhs. 15, 16, 17) This latter right was not taken or acquired in the present action nor included in the easements here appropriated. The present taking, comprising obstruction or clearance easements, was necessitated by and resulted from the extension of the principal runway at the Air Force Base by an additional 2,000 feet in 1957 and 1958. This extension of the runway, due to Air Force criteria, requires that all of the land in the approach zone or glide angle plane area be cleared and kept clear of any and all obstructions, whether hills, embankments of earth, trees, structures or obstructions of any character. The sole distinction between the 1953 easement affecting this land and the 1957 easement here acquired, insofar as concerns this clearance or obstruction feature, was to lower or reduce the elevation of the 1953 glide angle plane by 25 feet. As a result of topographical surveys it was determined that the only obstruction which invaded the glide angle plane easement of 1953 was a portion of Hill No. 2 located partly on Tract 211 and involving an area of approximately 2.3 acres. In this area the hilltop could be removed under the 1953 easement to a depth of approximately 6 feet. Due to the limited area involved, it appears that the Government did not exercise its right to excavate and remove that portion of Hill No. 2 on Tract 211 prior to the time the present easement was taken. (Govt.Exh. 1)

After the present easements were taken, topographical studies indicated that seven hills within the easement area required limited and partial removal because they extended into and above the glide angle plane. (Govt.Exhs. 21, 22) The Government at its expense removed approximately 2 million cubic yards of the earth comprising the highest elevation of these seven hills. A portion of Hill No. 1 was located within Tract 211, the remaining portion being embraced within Tracts 207, 208, 209 and 236, which have been the subject of previous trials or stipulations and orders fixing compensation.

Hill No. 2 was principally located in about the center of Tract 211, a portion thereof extending westward into Parcel 209. (Govt. Exhs. 1, 21, 22) Hill No. 3 was entirely located in or about the center of the northerly part of Tracts 211 and 212. Hills Nos. 4, 5, 6 and 7 were partly located in Tracts 216 and 218 and other parcels not here involved and previously disposed of. (Govt.Exhs. 1, 21, 22)

### Earth Removed Under Easement

It was conceded that the Government, in the exercise of its easement rights acquired herein, excavated and removed from that portion of Hills Nos. 1 and 2, lying within Tract 211 and from Hill No. 3, lying entirely within Tracts 211 and 212, approximately 453,451 cubic yards of earth and involving a total excavated area of 25.5 acres of the total area of 146.7 acres comprising said Tracts. The Government conceded that from those portions of Hills 4, 5, 6 and 7 lying in whole or in part in Tracts 216 and 218, it excavated and removed approximately 47,935 cubic yards of

earth from an area of approximately 5.16 acres. The total area of Tracts 216 and 218 involved in the easement was 66.90 acres. No earth was removed from Tract 223. Tracts 216, 218 and 223, comprising a total area of 94.30 acres within the easement area, were a part of an ownership of 286 acres, the remainder adjoining on the south and lying outside of and beyond the boundary of the easement.

It was conceded by the Government that the earth removed from Tracts 211, 212, 216 and 218, aggregating approximately 500,000 cubic yards, together with approximately 1,700,000 cubic yards of earth removed from other parcels within the easement area, was removed to other lands owned by the Government where the runway extension was being constructed and used as "general fill" in such construction. It was established by the Government's proof and not controverted that to remove this earth from the interior of these parcels, the Government, at its expense, acquired rights-of-way across adjoining lands, built and maintained roads to afford access for its machinery and equipment to public highways for a distance of some 3000 to 4000 feet; that it paid the cost of clearing the land of trees and natural growth and of disposing of this debris; of stockpiling and preserving such loam or top soil as existed; of excavating and removing the earth necessary to clear the glide angle plane; of restoring the stockpiled top soil, grading the area of the excavation to a uniform grade, fertilizing and seeding the area where the excavation occurred and generally restoring the land to better contours than obtained before the taking. (Govt.Exhs. 3, 4, 24)

The testimony establishes that the land upon which the runway extension was constructed in 1957 and 1958 was below the grade of the end of the runway as extended in 1953 (Govt.Exhs. 21, 22) and required over 2 million cubic yards of general fill, in addition to the select base material which was laid on top of the general fill and just below the concrete forming the runway surface. It is obvious that the Government's use of the earth removed from the area of the easements here involved was incidental to and not the object of the taking of the easement to remove the obstructions which produced the fill used. Had the Government required no fill for the construction of the runway extension, nevertheless the necessity to remove these obstructions was present and the Government would be required to find other areas for disposing of the earth excavated from the hills which intruded into the glide angle plane patterned for the extended runway approach zone. It is equally obvious that if these hills did not exist or did not require any excavation or lowering of their elevations, the Government could acquire by purchase vast unused areas in this locality to supply its fill requirements at the prevailing market price for scrub oak land of this character. The cost of such fill could not exceed the fee value of the land from which such fill was readily available.

General Discussion of Facts Established

Tracts 211 and 212 comprise a total area of 146.7 acres. (Govt.Exh. 1) In the exercise of its easement rights taken in this action the Government razed and removed 453,451 cubic yards of earth from that portion of the hills located on these parcels and lying in the central and northerly portions. The area involved in the excavation was conceded to be 25.5 acres. The remaining 121.2 acres was untouched and remained as before the taking.

At the time of the taking, the land was all uncleared scrub oak with the exception of a small area in the southerly part where an estimated 10,000 cubic yards of earth had been removed. (Govt. Exh. 26) In this southerly area and outside of the area excavated by the Government was a processing plant for the washing and separating of the earth into its component parts, which was predominantly sand and with a gravel content, variously estimated to be 17% to 25%

of the whole. No claim is asserted that the easements taken adversely affect the utility or value of the plant and machinery and these improvements have been excluded from the appraisals of the easements made for the owner and for the Government. No claim was asserted by the owner that the easements taken will in any manner interfere with the future operation of its plant or the removal of the earth remaining and it was conceded that as the earth is removed and the hills are reduced in elevation, the allowable height of buildings, structures or other improvements on the land will be correspondingly increased. The average excavation made by the Government approximated 15′. The excavations being made by the owner equal or exceed such depths. (Govt.Exh. 23)

The elevations of the glide angle plane above the land surface, as indicated by Government Exhibit No. 1, due to the irregular contour of the land, vary from heights of 19 feet at the northwest corner of Tract 211 to a height of 15 feet at the northeast corner. The height limitation along the easterly boundary from northeast to southeast ranges from 15 feet to 63 feet. The height limitations along the westerly boundary of this parcel range from 19 feet to 52 feet. In Tract 212, the height elevation of the glide angle plane above the land ranges from 15 feet at the northwest corner to 63 feet at the southwest corner, 94 feet at the southeast corner, and 15 feet at the northwest corner. As to Tract 216, the height limitations of the glide angle plane again vary according to the contour of the land. At the northwest corner of the parcel, the elevation is 55 feet; at the northeast corner 49 feet; at the southeast corner 74 feet and at the southwest corner 100 feet. As to Tract 218, the height limitation at the northwest corner is 41 feet; northeast corner 55 feet; southeast corner 87 feet; southwest corner 66 feet. As to Tract 223, the height limitation is 84 feet at the northwest corner; 100 feet at the northeast corner; 74 feet at the

southeast corner and 51 feet at the southwest corner. The lower elevations of the glide angle plane in the central portions of Tracts 211, 212, 216 and 218 where the excavations occurred, result from the hills located within these areas and which at the time of the taking intruded into the glide angle plane, causing the necessity to reduce their elevation approximately 15 feet.

The hill areas where the earth was partly removed by the Government are the highest elevations on the property, rising approximately 130′ above the elevations at the southerly and northerly boundaries. The extent of the excavation by the Government (average 15′ in depth) leaves available for removal by the owners the remaining portions of the hills which rise approximately 115′ above the level of the land at the foot of these hills. The area of excavation by the Government (25.5 acres) as to Parcels 211 and 212 leaves all of the 146.7 acres of land susceptible of further removal of millions of cubic yards of earth by the owner or any prospective purchaser. The same situation exists as to Parcels 216 and 218. It is academic that from one acre of land, by excavating only 3′ in depth, approximately 4,840 cubic yards of earth may be removed. (43,560 divided by 9) Multiplied by the depth to which these hills may be excavated without going below the elevation of the parcels at the northerly and southerly boundaries (elevation 100 MSL) and multiplying this result by the area involved (146.7 acres) produces a fantastic amount of removable earth still remaining in the parcels if, as assumed by the owner's appraiser, there will be a ready demand for such earth in the bank in perpetuity.

Tracts 211 and 212 have no frontage on a public highway. The nearest public road (Lewis Road) is over 3000 feet distant. Access is limited to a 25′ right-of-way extending from Lewis Road to the southwest corner of Tract 211.

The Government conceded by its proof that the easement taken as to Tracts 211

and 212 will limit the height of future construction or natural growth to 20' or less in an area of approximately 68 acres and that the 1953 easement which encumbered this land at the time of the present taking limited the height of a building, structure or obstruction to a height of 20' or less above ground level, in an area of 12.7 acres, which is included in the 68-acre area above referred to, so that the net area so limited and restricted by the present easement is approximately 56.3 acres of the total area of 146.7 acres involved. In the remaining area of 78 acres the height limitation is well above the 20' elevation. As to Parcels 216 and 218 the comparable area below the 20' elevation is 24.6 acres. These facts were not controverted.

An experienced materials technician employed by the Army Engineers took 109 samples at varying elevations from the area excavated by the Government on Tracts 211 and 212. Tests of these samples indicated an average gravel content of 17% and the balance sand with a slight trace of silt. Visual observations made by this expert throughout the areas of the excavations of those parts of Hills Nos. 1, 2 and 3, lying outside of Tracts 211 and 212, and of the excavations made in Hills Nos. 4, 5, 6 and 7 lying wholly or partly in Tracts 216 and 218 indicated the same relative composition of the earth. The defendants offered no proof of any samples taken or tests made within the areas of the excavations made by the Government or on adjoining parcels and it is reasonable to conclude that the earth composition is relatively the same throughout the entire easement area, except in the relatively small area where some land was cultivated. Sand and gravel constitute the principal components of most of the land on Long Island and their presence in varying proportions present no unique or unusual phenomena.

It would be an eerie conclusion, in the face of the evidence submitted and common sense, to assume that Nature or the glacial process of depositing this earth distributed its components with deference and discrimination to property boundary lines which have only recently come into existence.

### Tracts 216, 218, and 223

In visual appearance these parcels are very comparable to Tracts 211 and 212. They are not, however, contiguous and are each separated by an intervening ownership. (Govt.Exh. 1) The three parcels comprised a total area of 94.10 acres. (Parcel 216—49 acres; 218—17.70 acres and 223—27.40 acres) They are parts of larger parcels in the same ownership which aggregate approximately 286 acres. The land was typical scrub oak, uncleared and without road frontage except as to Tract 223, which had extensive frontage on both sides of a town road called Spinney Road. (Govt.Exh. 1) No part of the land within the area of the taking had ever been improved, cleared or utilized for any purpose as far as the evidence discloses. On a part of the land of which Tract B—223 is a part, but lying several hundred feet south of the easement area, a very considerable area on both sides of Spinney Road had in recent years been excavated for the removal of sand and gravel and the other components which comprised the earth. This operation, as a commercial undertaking by the Roanoke Sand & Gravel Company, ceased when it sold the land to the present owner in February 1955. Since that time the new owner, which acquired the land for a future proposed housing development, has sold in the bank approximately 5000 cubic yards of select base material (largely gravel), which was purchased by a local supplier of material at the rate of 40¢ per cubic yard. This material was used by the contractor who built the runway extension, not as general fill, but as select base material for the base of the concrete airstrip. The entire 286 acres of which these parcels form a part were sold by the Roanoke Sand & Gravel Co. to the Glanat Realty Co., Inc. on February 28, 1955 for $43,000 or at the rate of $150 per acre. A tentative plan of

subdivision was not filed or approved by the Town authorities and no attempted subdivision or housing development has yet been begun.

### Recent Sales of Tracts 211 and 212

In July 1953, by two conveyances from different owners, Tracts 211 and 212, comprising a conceded area of 146.7 acres, were purchased by McGarry and Roberts, experienced and long established sand and gravel operators, for the conceded purpose of the sale of the earth comprising these lands in the bank to contractors who might process it into its component materials or use for such purposes as needed. The consideration paid for the 146.7 acres aggregated $5,500 or $38 per acre. (Govt.Exhs. 6, 7) On February 23, 1955, Roberts sold his one-half interest in the two parcels to Tufano Contracting Corp. for $11,500 or at the rate of approximately $80 per acre for the one-half interest. (Govt.Exh. 8) On April 5, 1957, about 25 days before the taking of the easements by the Government, Tufano Contracting Corp. sold its one-half interest in the parcels for an indicated consideration of $12,000 or approximately $80 per acre to Edward and Samuel Tufano. (Govt.Exh. 10) On May 9, 1957, Edward and Samuel Tufano sold their one-half interest to Eastern Suffolk Concrete & Asphalt Corp. (herein referred to as Eastern Suffolk) for $12,000. (Govt. Exh. 11) On the same date,—May 9, 1957—McGarry sold his one-half interest in the property to Eastern Suffolk for an indicated consideration of $8,000. (Govt.Exh. 9)

Both conveyances into Eastern Suffolk were made after the date of taking of the easements here involved and subject to the 1953 avigation easement. Those conveyances purported or attempted to assign to Eastern Suffolk the future awards to be made for the easements condemned by the Government in this action. At the time of the taking of the easements (May 1, 1957), the property (Tracts 211 and 212) was still in the

ownership of McGarry as to an undivided one-half interest and Edward and Samuel Tufano as to the remaining one-half interest. The evidence established that at some prior undetermined date, the conveyances to Eastern Suffolk were agreed upon, the corporation having come into existence in March 1955. In any event, the proof established that the cost of this entire tract (Tracts 211 and 212) comprising 146.7 acres, to Eastern Suffolk was the sum of $20,000 or its dollar equivalent. (Govt.Exh. 10, 11, 14)

### Recent Sales of Tracts 216, 218, and 223

At or about the time McGarry and Roberts purchased Tracts 211 and 212 (1953), the Roanoke Sand & Gravel Co., Inc. purchased Tracts 216, 218 and 223, together with other lands of which said tracts constituted a part. The total area acquired, including said parcels 216, 218 and 223, was 286 acres. The price paid was approximately $40 per acre. This purchaser excavated and removed a considerable area of sand and gravel lying outside the easement area and sold the entire acreage of 286 acres to Glanat Realty Co., Inc. (herein referred to as Glanat) on February 28, 1955 for the sum of $53,000 or at the rate of approximately $150 per acre. (Govt.Exh. 30) It is undisputed that this land contained extensive sand and gravel deposits and that it was sold by a widely known and experienced sand and gravel company which had operated it for such purposes since acquiring it in 1953.

### Sand and Gravel

That all of the tracts of land under consideration are composed largely, if not entirely, of sand and gravel cannot be seriously questioned. The only samples taken and tested, from the area of the Government excavations, together with visual examination, adequately sustain the conclusion that the sand content of the earth greatly predominates. That this condition and situation obtains throughout the general area of the easement taking and surrounding areas is a reasonable assumption. The proof indi-

cates that the composition of the earth varies in different locations and at different elevations. It is noted, however, that this varying composition of the earth or the proportion of sand and gravel within the parcels now before the court has no factual relationship or influential bearing on the appraisal formulae or methods employed by the defendants' real estate appraisers, as will be hereinafter set forth. The owners' appraisers did not assign different values to the varying stratas of the earth in relation to the gravel content, but valued each. acre alike on the theory that each cubic yard of removable earth has the same value in place and before removal.

### Tracts 211 and 212—Owner's Appraisal of Easements

The owner of Tracts 211 and 212 (Eastern Suffolk) claims compensation in the amount of $220,000 for the easements taken by the Government, as compared with a total cost of the fee to the company of $20,000 in May 1957. In support of this claim, the company offered the testimony and written appraisal of James Sheridan, a real estate appraiser of Long Island City, Queens County, New York. (Def. Eastern Suffolk Exh. "C")

It does not appear from his testimony that he had ever engaged in the real estate or appraisal business in Suffolk County; that he had ever bought or sold any real estate in that county on his own account or for others as a broker; that he had ever previously appraised any land in this town or kept himself familiar with prices and trends of value as reflected by sales by others. He conceded that the orthodox and accepted method of appraising an easement is to fix the fair market value of the land "before" and "after" the easement is imposed and that the difference in the two findings represents the damage attributable to the easement rights taken or imposed. It does not appear that he had ever previously appraised an easement of the nature here involved and

erroneously assumed that the easement acquired in 1953 was identical in character with the easement taken in this action. He had neither read nor had been furnished with a copy of this court's decision in this case of July 24, 1958, distinguishing these easements. United States v. 765.56 Acres, supra.

His appraised fair market value as of May 1, 1957 of these parcels, comprising 146.7 acres, excluding any improvements, "before" the taking of the easement in this action was $250,000. This value necessarily had to be the value of the land as encumbered by the 1953 easement which permitted the removal of earth from an area of 2.3 acres and to a depth of approximately 6 feet and otherwise limited the height of buildings, structures and natural growth on the land or which might be placed thereon. While his appraisal report lists sales in the area which he had considered and which indicated land unit values varying from $335 to $550 per acre, he testified that the sales were not used as a basis of his appraised value nor were any sales relied on in reaching his conclusion. He conceded that the sales set forth in his report were the highest prices found and that other sales were discovered at lower prices. He indicated lack of personal knowledge of the physical character of the recital sales as to road frontage, etc., but conceded that on all these properties there was earth capable of being excavated and used for fill. His appraised value of $250,000 before the taking of the 1957 easement in this action was arrived at as follows:

"Appraiser's Important Conclusions:

"No attempt is made by this appraiser to evaluate the underlying resources of these tracts as a processed product. Their content is considered as earth only and which contains a minimum value unexcavated in the site of fifty cents (.50¢) per cubic yard.

"It is estimated that the yearly income from the sale of earth at fifty cents per cubic yard for an average of 75000

cubic yards sold each year yields a gross income to the owner of $37500. After deduction of fixed and operational expenses for taxes, insurance, clerical and supervisional personnel which are estimated at $12500, the net yearly income to the owner is estimated at $25000.

"The net income of $25000. capitalized at ten (10) percent reflects an estimated value of the right of ownership in perpetuity of $250000. or about $1700. per acre for approximately 147 acres as of April 30, 1957."

\* \* \* \* \* \*

"INCOME APPROACH TO INDICATED VALUE

APPRAISED

"Value of the Whole (Before) . $250,000.

"*Divided—Land*—146.7 acres at $1700. per acre

"75000 cubic yards of earth excavated yearly at .50¢ per cubic yard or

"Gross Income of $37500.

"*Expenses:*

"Payroll, taxes, insurance at 12500.

"*Net Income* $25000.

"Net Income of $25000 capitalized at 10 percent reflects indicated value of $250000.

"Value of the Remainder (After) 30000.

"*Divided—Land*—Subject to permanent avigation easement—146.7 acres at $235. per acre or

"Difference or Damage $220,000.

"*Divided—Land*—

"*Direct Damage for earth taken*

"456000 cubic yards at .45¢ per cubic yard or $205000.

"*Severance*

"Diminution in value sustained 146.7 acres by imposition of permanent avigation easement at 15000.\*

\*Reflects approximately $100. per acre." (Def. Eastern Suffolk Exh. "C")

It thus appears that he has treated these parcels for appraisal purposes as comprising removable "earth", having an "in place" value of 50¢ a cubic yard and without regard to its sand and gravel composition. His appraisal method excludes any consideration of plant, plant equipment or of processing the earth into its component parts. The result obtained is a capitalized value of the anticipated profits or net income from the sale of the earth in place (in the bank) at the rate of 75,000 cubic yards per annum "in perpetuity", which he estimated to be $25,000 per year. On this basis, he fixed an over-all unit value of the land at

$1,700 per acre, or $250,000 for the parcels before the taking of the easement in this action. This compares with the cost to the owner of approximately $136 per acre or $20,000 on May 7, 1957. Such a method of valuation obviously rests upon pure speculation and conjecture, is without factual support for the assumptions upon which it is predicated, or any sales of land susceptible of the same utility.

Equivalent and essentially the same method of appraising land containing sand, gravel or minerals has been previously rejected by this court and the great weight of judicial opinion lends no support to a valuation so contrived, United States v. 5 Acres of Land, etc., D.C.E.D. N.Y.1942, 50 F.Supp. 69. United States v. Certain Lands, (Forest of Dean Iron Ore Co.), D.C.S.D.N.Y.1943, 51 F.Supp. 66; and 52 F.Supp. 314; United States v. 69.67 Acres of Land, D.C.E.D.N.Y. 1957, 152 F.Supp. 441; affirmed sub nom. United States v. Chase, 2 Cir., 260 F.2d 405; United States v. 620 Acres of Land, D.C.W.D.Ark.1952, 101 F.Supp. 686; United States v. Land in Dry Bed of Rosamond Lake, Cal., D.C.S.D.Cal.1956, 143 F.Supp. 314; United States v. 13.40 Acres of Land, D.C.N.D.Cal.1944, 56 F. Supp. 535; United States ex rel. Tennessee Valley Authority v. Indian Creek Marble Co., D.C.E.D.Tenn.1941, 40 F.Supp. 811; United States v. 342.-81 Acres of Land, D.C.N.D.Ga.1955, 134 F.Supp. 430; Georgia Kaolin Co. v. United States, 5 Cir., 1954, 214 F.2d 284, 286; United States v. Meyer, 7 Cir., 1940, 113 F.2d 387, certiorari denied 311 U.S. 706, 61 S.Ct. 174, 85 L.Ed. 459.

In United States v. 69.67 Acres, supra, [260 F.2d 405] this court was confronted with a similar and essentially comparable claim to compensation for the alleged value of earth in place (in the bank), concededly containing deposits of sand and gravel, and from which, just prior to the Government taking of a part of this land, some 4,500 cubic yards of this material had been sold in the bank at 25¢ per cubic yard. It was estimated that some 5 million cubic yards of similar material could be sold in place for 25¢ a cubic yard over a future 6-year period, yielding to the owner a profit of some $1,279,625 and that, as a result of the taking of some 6.98 acres of the land in fee and additional easements, the plan of removal was frustrated and a loss of estimated profits resulted. This court recognized that the presence of such deposits might enhance the value of the land to some degree and considered it, but rejected the formula and method of appraisal as one which was founded largely upon conjecture and speculation. The Court of Appeals for this circuit, in unanimously affirming, took occasion to observe that "if this factor (sale of sand and gravel in the bank) was wholly excluded from valuation, we hold that his valuation was not erroneous." It should be obvious that if land values are enhanced by the presence of removable earth and the sale thereof in place or as processed components, the proper and only correct method of establishing the value of such land is by sales of land in the area having similar or comparable characteristics and deposits. The recent sales of the property under consideration, both before and after earth had been removed and sold, as well as other sales of comparable property, both within the easement area and in the nearby neighborhood containing similar deposits should constitute the best evidence of the value of this land before the taking. No sales were submitted that would indicate that any land in this area had ever been sold on such a basis of valuation as that used by Sheridan. The sales of Tracts 211 and 212, in 1953, 1955 and 1957, involved purchasers who were fully informed and experienced in the business of buying and selling land with sand and gravel deposits, and it must be assumed that the prices paid fairly represented the parties estimate of land value involved. Sheridan evidently ignored these sales.

If we were to assume, arguendo, that such a parcel of unimproved scrub oak land, which sold for $20,000 in 1957, had

a fair market value "before" the taking of the easement in May 1957 of $250,000, based upon capitalization of anticipated future profits in perpetuity from the sale of the earth in place, the next step in the acknowledged appraisal problem is to determine the value of that same land "after" the easement was imposed. The fair market value of this entire parcel of 146.7 acres, after the taking of the easement, was fixed by Sheridan at $30,000 which, deducted from the "before" value of $250,000 leaves a loss in value attributable to the easement of $220,000. (Def. Eastern Suffolk Exh. "C")

The value of $30,000 placed upon this tract of 146.7 acres "after" the taking of the easement is patently erroneous, if we are to assume that the "before" value of this land was $250,000 or $1,700 per acre. It was conceded that the total area involved in the Government's excavation was 25.5 acres, leaving the remaining area of 121.2 acres completely untouched and from which no earth was removed. It was further conceded by Sheridan that the taking of the easement had not and would not in any manner interfere with or deprive the owner of the opportunity of selling in place or removing the remaining earth of which this tract was composed. It would therefore necessarily follow that from the standpoint of valuing this land "after" the taking of the easement, on the basis of the value of the earth in place which remained, that 121.2 acres of the land retained its full value of $1,700 per acre and the remaining 25.5 acres, comprising the highest elevations of the land and which was reduced in elevation by the Government to the extent of approximately 15 feet, retained a substantial, if not predominant part of its original value of $1,700 per acre.

The "after" value of this tract of 146.7 acres should approximate $238,553 using Sheridan's method of appraisal, if we assume that the area excavated of 25.5 acres, retained 75% of its value for earth removal. It is apparent that even if we were to accept the method of valuation employed by Sheridan, the "after" value of $30,000 is completely erroneous. The appraisal report of Sheridan, which was offered in support of the claim of the defendant Eastern Suffolk, and the methods of appraisal employed by him must be completely rejected by the court as not affording any rational basis for the "before" or "after" value of this land and the diminution or loss in value attributable to the easements imposed by the Government.

The compensation required to be paid for the taking of an easement should reflect the damage to or loss in market value of the land upon which it is imposed and which results from the impairment of its future utility for all available uses for which it may be suitable and adaptable. (See cases cited under "Question Presented" supra) Such compensation is not intended to represent the value of or compensation for the interests taken but the damage or loss in market value to the remainder resulting therefrom.

Sheridan in his appraisal has confused the problem or does not understand the distinction in these concepts for, with the exception of $15,000 allocated to damages resulting from the easement—($100 per acre for 146.7 acres), the remaining damage of $205,000 is attributed to the alleged value of 453,561 cubic yards of earth in place which was removed under the easement. If he were to apply this same measure of value to all of the earth available for sale in the bank, both before and after the easement was imposed, both such valuations would far exceed his unit value of $1,700 per acre based upon capitalization of anticipated profits or "net income".

In his appraisal report (Def. Exh. "C"), he refers to the depreciation due to the easement as "severance damage", which he places at approximately 6% of the "before" fee value—($15,000 or $100 per acre). Depreciation attributable to an easement and "severance damage" involve essentially different appraisal as well as legal concepts, which

**14**

indicates a further misunderstanding of the appraisal problem with which he was confronted. The concept of severance damage has no application to the taking of an easement but relates solely to the depreciation to the remainder property, where a part of a single parcel is taken in fee. United States v. Miller, 1943, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336; United States v. Honolulu Plantation Co., 9 Cir., 1950, 182 F.2d 172, certiorari denied 340 U.S. 820, 71 S.Ct. 51, 95 L.Ed. 602; International Paper Co. v. United States, 5 Cir., 1955, 227 F.2d 201; Cole Investment Co. v. United States, 9 Cir., 1958, 258 F.2d 203; Sharp v. United States, 191 U.S. 341, 24 S.Ct. 114, 48 L.Ed. 211; Campbell v. United States, 266 U.S. 368, 45 S.Ct. 115, 69 L.Ed. 328.

■ A very considerable amount of proof was devoted to the special and unique value of Tracts 211 and 212 to Eastern Suffolk because of its allied relationship to Tufano Contracting Co., which latter corporation purchased or was a potential customer for some 80% of its processed material. There was an acknowledged close identity of interests between these two corporations. This line of proof is considered irrelevant. The value of this land, both before and after the taking, as well as the easements, must be established in disregard of any special value to its present owner or to the Government. United States v. Miller, 1943, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336; United States v. Petty Motor Co., 1946, 327 U.S. 372, 377, 66 S.Ct. 596, 90 L.Ed. 729; United States v. 51.8 Acres of Land, D.C. E.D.N.Y.1957, 151 F.Supp. 631, affirmed sub nom. United States v. Jones Beach State Parkway Authority, 2 Cir., 1958, 255 F.2d 329. Extensive proof as to the selling price of processed sand, gravel, grits, loam, etc. was likewise submitted. This proof also is considered irrelevant because the owners' claims are predicated on claimed values of the earth in place (in the bank), without any processing entering into the computations. Significantly, however, no proof was offered that the sale and removal of earth from this land in bank or as processed components ever has been a profitable enterprise since Eastern Suffolk took over operations in 1955 or prior thereto, when the property was operated by McGarry and Roberts. (Govt.Exhs. 13, 14, 18, 19, 20)

There have been no facts adduced at this trial which suggest that the area of 25.5 acres excavated by the Government on Tracts 211 and 212 under its easement, had a market value of $8,000 per acre for a depth averaging 15 feet ($205,000 divided by 25.5 acres), or that if the excavation had proceeded for an additional depth of 15 feet, the strata of 30 feet would have had a market value of $16,000 per acre. Such estimates cannot be reconciled with a unit value of $136 per acre paid for this land in fee at about the date this easement was appropriated. The proof supplied by the defendant, Eastern Suffolk, fails to support the suggestion and opinion of its appraiser that scrub oak land in Suffolk County can be disposed of to willing buyers at the rate of 40¢ per cubic yard or that the unit value of land of this character is to be established on a cubic yard rather than an acreage basis.

It should appear obvious to any qualified real estate appraiser that the depreciation attributed to an easement cannot exceed the fee value of the land before the easement is imposed. Despite this obvious conclusion, Sheridan appraised the 25.5 acres excavated on Tracts 211 and 212 at $1,700 per acre "before" the taking of the easement, which includes necessarily all of the earth of which said area was composed. His valuation of $205,000 attributed to the earth removed from the same area represents approximately $8,000 per acre and to which he adds an additional $100 per acre or $2,550 for "severance", or a total of $207,550 depreciation for an area which he appraised at $43,350 before the easement. (25.5 x $1,700.)

The conclusion is equally inescapable that the value of earth in place or in the bank cannot, under any circumstance, exceed the fee value of the land.

### Claim of Defendant Glanat Realty Co. as to Tracts 216, 218 and 223

Tract 216, comprising 49 acres, is located 350 feet east of Tract 212 (Eastern Suffolk). Tract 218 is 100 feet east of Tract 216 and Tract 223 lies further to the east, a distance of 225 feet. These three parcels, comprising a total area of 94.10 acres, are all similar and comparable to Tracts 211 and 212 and consist of unimproved, uncleared scrub oak land typical of the area. These three parcels, all owned by Glanat as of the date of taking of the easement on May 1, 1957, comprise parts of a total area of 286 acres purchased by Glanat from Roanoke Sand & Gravel Company on February 3, 1955 for $53,000 or at the rate of $150 per acre. (Govt.Exh. 30)

Between the date of their acquisition in February 1955 and the date of taking of the easements no physical changes had occurred nor had the purchaser filed any proposed subdivision plan or taken any steps to physically subdivide the area or any portion thereof. At the time of the taking of the easement the land was unzoned. However, there were in effect regulations of the Town for the approval of subdivision plans and which required that all lots for residential use should have a minimum area of 9,375 square feet. (Govt.Exh. 28) These regulations were adopted on May 8, 1952. At the time of the taking there was also contemplated a formal Building Zone Ordinance, which had been the subject of discussion for several years, and which became effective October 14, 1957,—about 5½ months after the date of taking. (Def. Eastern Suffolk Exh. "E"). The parcels now under consideration in said Building Zone Ordinance were classified as "Residence-C" and "Agricultural District" and provided that the minimum residential plot be not less than 15,000 square feet.

It was conceded that the Government, in the exercise of its easement acquired herein, removed approximately 47,000 cubic yards of earth—(owner's estimate —31,550)—from the four hilltops located within these parcels and that the total area involved in the excavation was 5.16 acres. The average depth of the excavation was 15 feet,—sufficient to reduce the obstructions created by these hilltops below the glide angle plane described in the easement. It was further established that in an area of 24.6 acres of Tracts 216 and 218, the glide angle plane is at an elevation of 20 feet or less above ground level. In this area 2 acres were similarly restricted under the 1953 easement hereinbefore referred to. In the remaining easement area, the elevation of the restricted airspace ranges from 20 feet to 100 feet above the land surface. (Govt.Exh. 1)

The claim of Glanat to compensation for the easement taken was predicated on a somewhat different basis than that of the claim of Eastern Suffolk as to Tracts 211 and 212. Whereas Eastern Suffolk claimed that the highest and best use of Tracts 211 and 212 was for "earth" removal and based its claim to compensation upon the projection and capitalization of anticipated profits in perpetuity for the value of such earth in place or in the bank, Glanat contended that the highest and best use of the land was for residential subdivision purposes. Glanat's real estate appraiser, however, did not undertake and was not employed to appraise the value of these parcels before and after the taking of the easement and except by inference, such values were not established. His approach to the value of the property involved in the taking of the easements was on the basis of the theoretical value of this land as subdivided into plots (75′ x 100′), having areas of 7,500 square feet, which he considered as having a retail value of $125 per plot. He estimated that four of such plots, including areas required for street improvements, could be obtained from each acre and that $500 per acre, being the estimated retail price of four lots, could eventually be obtained from the sale of such subdivided units. Such subdivision of this land, of course, would be in violation of the regulations of the Town of Southampton in effect on the date of taking and which required a min-

imum of 9,375 square feet for a residential plot and also in violation of the ordinance which became effective October 14, 1957, which required a plot area of 15,000 square feet. No attempt was made by the expert for Glanat to estimate the engineering cost or expenses to be incurred in the subdivision of such land into residential plots or the net value which could be derived from the land, if such a theoretical subdivision were undertaken. No sales of building plots in this area were cited by the expert to justify the conclusion that this land in its undeveloped state had a value of $500 per acre. The method employed by Glanat's real estate appraiser to arrive at a value of $500 per acre for this raw, undeveloped and uncleared land is unquestionably erroneous and an improper method of valuation. United States v. 63.04 Acres, D.C.E.D.N.Y.1956, 142 F. Supp. 239; Bank of Edenton v. United States, 4 Cir., 1945, 152 F.2d 251; United States v. Certain Parcels of Land, etc., 5 Cir., 1945, 149 F.2d 81; United States v. 3.544 Acres of Land, etc., 3 Cir., 1945, 147 F.2d 596, 598; United States v. Iriarte, 1 Cir., 1948, 166 F.2d 800, certiorari denied 335 U.S. 816, 69 S.Ct. 36, 93 L.Ed. 371.

The witness concluded that, as a result of the easement restriction which prohibited any building or structure in excess of 20 feet on 90 of the supposititious plots, involving an area of 22.5 acres within Tracts 216 and 218, these lots lost all of their retail value of $125 each and that the total fee value of this 22.5 acres which was entirely destroyed by the taking was $11,250. (90 x $125.)

In view of the much higher elevations to which buildings and structures could be erected on Tract 223, no damage was imputed by the witness to the easement taken as to this tract and the attorney for the owner stipulated that the owner would accept the percentage loss in value involving Tract 223 as computed by the Government's appraiser.

It will therefore be observed that as to Tracts 216 and 218, the owner claims the total fee value of approximately 22.5 acres, as representing 90 building plots of 7,500 square feet each, plus street areas, within these two parcels. It was within this 22.5-acre area that 5.16 acres required excavations and the removal of earth and within the area where the height limitation of buildings and structures, due to the elevation of the glide angle plane was 20 feet or less. Notwithstanding that this area of 22.5 acres, which included the 5.16 acres excavated, was depreciated by the expert 100% of its fee value as a result of the easement, the owner claims additional compensation for the alleged value of 31,-550 cubic yards of earth removed at the rate of 40¢ a cubic yard in place or in the bank and before excavation.

■ It is obvious therefore that the claim for the earth in place which was removed is included in the claimed depreciation of the land from which the earth was removed and where the depreciation was estimated at 100% of the "before" value by reason of the height limitation of buildings and structures which could be erected within this area. It should be plain that the owner cannot be compensated for the excavated area on the basis of the value of the earth in place and also be paid for the full fee value of the area excavated.

It would appear that the owner's total claim to compensation is approximately $23,870 as to Tracts 216 and 218. This total claim comprises $11,250 representing the full fee value of approximately 22.5 acres (90 plots including street areas) and an additional sum of $12,-620 representing the "in place" value of earth removed by the Government from 5.16 acres included within the 22.5-acre area. (31,550 cubic yards x 40¢ = $12,-620.)

The unit value of the land embraced within the easement areas in Tracts 216, 218 and 223 for subdivision purposes, at the rate of $500 per acre, is not supported by any recent sales of land in this area which had limited or no road frontage and is not supported by the recent sale in February 1955 at $150 per

acre of the 286 acres, of which these parcels form a part. (Govt.Exh. 30)

There is no justification for the appraiser's conclusion that 22.5 acres of Tracts 216 and 218 has lost all of its value by reason of the easement restrictions which limit the buidings and structures to 20 feet or less. It is a rare instance where restrictive easements of this character extinguish all remaining value and utility of the lands subjected thereto. United States v. 51.8 Acres of Land, D.C.E.D.N.Y.1957, 151 F.Supp. 631, affirmed sub nom. United States v. Jones Beach State Parkway Authority, 2 Cir., 1958, 255 F.2d 329, certiorari denied 358 U.S. 832, 79 S.Ct. 55, 3 L.Ed.2d 71; United States v. 102.93 Acres of Land, D.C.E.D.N.Y.1957, 154 F.Supp. 258, affirmed sub nom. United States v. Fox, 2 Cir., 1958, 257 F.2d 805; United States v. 26.07 Acres, D.C.E.D.N.Y.1954, 126 F.Supp. 374; United States v. 48.10 Acres, supra; United States v. 72.35 Acres, supra; United States v. 765.56 Acres, supra; United States v. 69.67 Acres, D.C.E.D.N.Y.1957, 152 F.Supp. 441, affirmed sub nom. United States v. Chase, 2 Cir., 1958, 260 F.2d 405.

The claim to compensation asserted by the defendant Glanat must be rejected by the court for the reasons hereinbefore set forth.

Significance of the Government's Use of Earth Removed as Obstructions

The defendants Eastern Suffolk and Glanat have emphasized throughout the trial and apparently considered significant, the fact that the Government used as "general fill" the earth removed as obstructions under its easement, in the construction of an extension of its runway or airstrip at Suffolk County Air Force Base. Whether or not the Government could or did use the earth so removed within the easement areas, has no bearing on or relation to the question presented for determination by this court,—namely, the extent of depreciation to the land that remained, which resulted from the easement rights taken or

exercised. The problem and situation presented for judicial consideration and determination would be no different had the obstructions which were removed consisted of trees, structures or buildings located on the land and removed pursuant to the easement appropriated. Whether or not the Government could or did utilize the removed trees as lumber or the structures as material of which they were composed, does not have significance in estimating the depreciation of the remaining real estate as the result of such removal. The problem remains the same, regardless of what the Government could or did do with that part of the realty removed or destroyed under its easement. The difference between the fair market value of the land before and after the taking of the easements, which granted the right of removal of the obstructions, is the test and measure of just compensation required to be paid and has no conceivable connection with or relation to the value or utility of what was removed, when separated from the land and after the material became personal property.

It should be noted that both defendants predicate their claims, as far as earth removal is concerned, upon its value in place and not as detached and separated from the land. It should follow, if land is to be so evaluated, that the defendants should have computed the "before" value of the land on the basis of the value of all earth capable of removal at a dollar unit per cubic yard and the "after" value on the same assumption. This method was, however, not adopted and it should be plain that the methods employed represent an attempt to value the land "before" the taking on an acreage basis and value the part which was removed on a cubic yard basis. Whether or not the removed earth was used by the Government, the conclusion is inescapable that the portion of the earth (land) removed can have no greater value than the amount which it contributed to the value of the land before removal.

Government's Claim as to Just Compensation

The United States of America, petitioner-plaintiff, contends that the total just compensation which it should be required to pay for the easements condemned herein as to the tracts under consideration is as follows: For Tracts 211 and 212, the sum of $8,572 and for Tracts 216, 218 and 223, the sum of $3,778. (Govt.Exh. 31) The basis of the just compensation is set forth in the appraisal report of Frank J. Smith, as follows:

"APPRAISED VALUE—TRACTS B–211E AND B–212E

"Value Before:
"12.7 acres (height limitation in 1953 easement
          20' or less) at $200. x 20% ...............$    508.
"134 acres (height limitation over 20' in
          1953 easement), nominal damage, x $195 .... 26,130.
                              Total, before           $26,638.

"Value After:
"68 acres (height limitation in 1957 easement,
          20' or less) at $200 x 20% ...............$ 2,720.
"78.7 acres (height limitation over 20', nominal
          damage x $195.) ...................... 15,346.
                              Total, after            $18,066.

                              Damage .............$ 8,572."

"APPRAISED VALUE—TRACTS B–216E AND B–218E

"Value Before:
"2 acres (height limitation in 1953 easement
          20' or less) at $200. x 20% ...............$     80.
"64.7 acres (height limitation over 20' in 1953
          easement) nominal damage, x $195 ........ 12,617.
                              Total, before           $12,697.

"Value After:
"24.6 acres (height limitation in 1957 easement
          20' or less) at $200. x 20% ...............$    984.
"42.1 acres (height limitation in 1957 easement
          over 20'), nominal damage, x $195 .......... 8,210.
                              Total, after             9,194.
                              Damage .............$ 3,503."

"APPRAISED VALUE—TRACT B–223E

"27.4 acres, 1957 easement, height limitation
          "47' or more, nominal damage, at $400. x 2½% .......$    275."

(Note: The areas above set forth, where the height limitation is
          20 feet or less, include the excavated areas)

————◆————

Smith has appeared before this court as an expert on real estate values in Suffolk County in a number of condemnation actions instituted by the Government in recent years,—1952 to date. He has had extensive experience in ap-

praising easements of the character here involved. For some 32 years he has lived in Suffolk County and engaged in the real estate and appraisal business in Riverhead, about five miles from the land involved in this project. In this period he has acted as a broker and real estate appraiser, has bought, sold, and appraised land in this county. He has continually kept himself informed as to sales and real estate trends and values. During the past eight years he has appraised several thousand acres of lands of all types to be found in the county for the United States, as well as for private employers. His qualifications and opinions of value of lands in fee and depreciation attributable to easements of this nature have been highly regarded and relied on by this court in previous hearings and the fixing of compensation of other parcels in this action, as well as a number of other actions involving fee and easement acquisitions in this immediate area. United States v. 765.56 Acres, supra; United States v. 99.26 Acres of Land (C.P. 105) decision dated July 23, 1958 (not reported); United States v. 765.56 Acres, (C.P. 108)—Findings of fact and conclusions of law entered January 5, 1959; United States v. 102.93 Acres of Land, etc., D.C.E.D.N.Y.1957, 154 F. Supp. 258, affirmed sub nom. United States v. Fox, 2 Cir., 1958, 257 F.2d 805.

Smith has testified in other actions involving the acquisition of comparable land for the Government involving projects related to and adjacent to Suffolk Air Force Base. These acquisitions involved land comparable to that now before the court. The testimony of Smith and his conclusions of depreciation attributable to these easements in prior trials involving other and contiguous parcels in this same action, have been previously considered, accepted and generally adopted by the court in its previous findings of fact and conclusions of law heretofore filed herein.

Smith's appraisals of these parcels "before" taking of the easements are amply supported by many sales in the immediate vicinity, as well as by recent sales of the parcels now under consideration. Several sales involved land which had in the past, as well as of the date of taking, been used for the removal of sand and gravel and other component materials. Smith related in detail about 12 recent sales of land within the project, adjacent, or in close proximity thereto. The variation in the unit land values reflected by these sales resulted principally from the extent and character of public road frontage, the extent of cleared land and other factors which influenced the prices paid. The sales relied on by Smith justify accepting and adopting the "before" value of the parcels here involved and as set forth in his appraisal report. (Govt.Exh. 31) The depreciation attributed to the easements and the "after" value of the land is supported by experienced judgment, common sense and past findings of this court in this and similar easement acquisitions.

The court has considered the value of the land, as well as the depreciation due to the easements in the light of all available uses for which the land is suitable and adaptable and for which a market and demand existed or can be foreseen in the reasonably near future. Smith concluded that his depreciation factor would be less or diminished, had he considered the use of the land solely for earth removal. With this conclusion the court is in agreement.

Conclusion as to Just Compensation

Considering the recent sales involving all of these parcels, all the testimony and proof adduced at the trial, the applicable law and the knowledge acquired by previous personal inspection of the land and vicinity, it is concluded that the just compensation which should be paid by the Government for the easements appropriated is as follows:

Tracts 211 and 212 ....... $8,572.
Tracts 216, 218, 223 ...... 3,778.

The foregoing findings of fact and conclusions of law are narrative in form

and are considered adequate to dispose of the issues presented.

Settle judgment.

### Supplemental Findings of Fact and Conclusions of Law

1. The testimony conclusively demonstrates that the current and prevailing market price and value of scrub oak land of the type now under consideration as of May 1, 1957, the date of taking and valuation with limited or no road frontage and free and clear of any liens, encumbrances or easements, was at the rate of $200 per acre. This conclusion is consistent with this court's previous decision in this same proceeding but involving other adjoining or contiguous parcels having similar physical characteristics and utility. United States v. 765.56 Acres, D.C.E.D.N.Y.1958, 164 F.Supp. 942; see also this court's findings of fact and conclusions of law in this action filed herein on January 5, 1959.

2. All of the parcels of land of a scrub oak character, which have been the subject of previous decision of the court and findings of fact and conclusions of law establishing market value in this proceeding, were susceptible of earth removal if such an operation were to be considered as the highest and best use of such land, but there is nothing in the proof adduced during the trial of this action to faintly indicate that land of this character has been sold on the basis of computing the income or return from the future sale on a yardage basis of the earth comprising such land.

3. Recent sales of all of the parcels now under consideration, as set forth in the main findings of fact and conclusions of law, as well as sales of other comparable properties susceptible of the same utility in the immediate neighborhood and vicinity, are considered the best evidence upon which this court can rely in fixing the value of these parcels "before" the imposition of the easement. United States v. 63.04 Acres of Land, More or Less, 2 Cir., 1957, 245 F.2d 140; United States v. 49,375 Sq. Ft., D.C.S.D.N.Y., 92 F.Supp. 384, affirmed United States v. Tishman Realty Const. Co., 2 Cir., 1952, 193 F.2d 180, certiorari denied 343 U.S. 928, 72 S.Ct. 761, 96 L.Ed. 1338; Simmonds v. United States, 9 Cir., 1952, 199 F.2d 305, 307; United States v. 13,255.53 Acres, 3 Cir., 1946, 158 F.2d 874; United States v. Certain Parcels of Land in City of Philadelphia, 3 Cir., 1944, 144 F.2d 626, 629, 155 A.L.R. 253; United States v. Lambert, 2 Cir., 1944, 146 F.2d 469; United States v. Delano Park Homes, 2 Cir., 1944, 146 F.2d 473.

4. With reference to the claim submitted by Glanat Realty Corp. (Tracts 216, 218 and 223) in amount of $14,000 as the alleged estimated cost of the construction of a road, gas and water mains in Tracts 216 and 218, in connection with some future subdivision or development of this property for residential homesites, this claim must be rejected as purely speculative and conjectural, as the testimony indicates and this court has previously decided that the future development and subdivision of this land for such utility is extremely remote. If such a claim were to be given weight, it would have to be reflected in the depreciation of the value of the remainder land resulting from the easement imposed and not as a separate consequential damage item. As has been previously indicated, no testimony was submitted by the owner of these parcels concerning the value of this land in its entirety before the easement was imposed or the value of the land after the easement was imposed and there is no rational basis for concluding that an item of damage of this character represents a damage attributable to the taking or exercise of the easement here involved.

Settle judgment.